We'll start with the call of the docket. The first case is Department of Transportation v. Petroleum Fuel & Terminal Co. Counsel, whenever you're ready, you may proceed. May it please the Court, good morning. My name is Lori Dacos. I am here on behalf of the appellant, Petroleum Fuel & Terminal Co. Your Honor, we are here today because the appellant is a landowner in the 5th District in the state of Illinois. We're here to ensure and to ask this Court to ensure that IDOT or any governmental actor respects the law and the right of private citizens to negotiate in good faith when exercising eminent domain. The argument and the brief submitted to the Court will show that the lower court ruled against the manifest weight of the evidence in finding that IDOT in this particular case acted in good faith when negotiating with the appellant. Specifically, what the appellant is asking this Court to do is to reverse the lower court's ruling granting title to IDOT in the quick take hearing and to remand with instructions to the lower court to put title back into the appellant's name. Your Honor, the brief submitted to this Court suggests compellingly that there is a rule that IDOT or any governmental actor that's acting in good faith must negotiate and must submit offers before filing a lawsuit for condemnation that correlate to the fair market value of the property. Particularly guiding is the 1st District case, the Chicago v. Zepini, which had facts very similar to the case here at Bar. In the case that we are arguing today before this Court, there was a pre-suit offer of $33,000 within a span of 4 months from August 2012 until January 30, 2013. That price doubled when IDOT did its appraisal. The testimony that is in the record before the Court at the quick take hearing was that nothing changed except the parameters that the appraiser used to value the property. Why would that be a sufficient change to make the good faith offer? Well, Your Honor, what I would suggest, and I think that the appellee relies heavily on the fact, citing two Supreme Court cases, that if there is a legitimate appraiser who is qualified, that that is a per-segment good faith negotiation. That's a forced preservative. That's correct. And also IDOT, there was a second case. I would agree with that proposition, however, that is indistinguishable from the case at Bar because if the Court looks in the appellant's reply brief, page 5, what happened here is IDOT changed the parameters to their appraiser, and that is what affected the doubling in the value. Specifically, and I'm referring to the report of proceedings, 55 lines 14 through 21, the appraiser testified at the quick take hearing. When I was updating it for the complaint as of this date, and I looked at it, and the department wanted me to do it as the whole property with improvements to be distinguished between how she did it the first time, I decided to use larger comparable sales. So I don't think IDOT can rest authoritatively on those cases, specifically the forced preserve case, because I think they're incredibly distinguishable from this case in that IDOT changed the rules that it instructed to its appraiser for the comparables and what it is to use. So, yes. Well, looking at the first criteria that the appraiser was supposed to use, was that a fair market value? I don't think so. Why not? I think that the fair market value of it is what was established at the quick take hearing, which is $63,000. Well, when you do the quick take, the fair market value has to be as of that date. I understand that. But with the criteria that were initially established, looking at that criteria, let's assume for the sake of argument that quick take was on that date. These are the criteria that the appraiser got. Why wouldn't that be a fair market value assessment? Because I think that the testimony at the lower court hearing, Your Honor, respectfully, indicated that the appraiser looked at it and that when she looked at what it was, she thought that the fair market value was in line with the $63,000 number. And so I think that if the court looks at the city of Chicago versus Zipini and the city of Naperville, where there was a 40% to 60% increase in a relatively short window of time as well, those facts are in line with the facts that we have here. We're talking about a doubling in value. And the only factor that changed was the use of comparable numbers. But wouldn't that necessarily change or very frequently change the appraisal value? Well, I think it would. But then don't we have to look beyond just the values? We have to look at the reason and whether or not that was appropriate to change the comparables. No. I would suggest that what is appropriate is what the fair market value property is. At the quick take hearing, the appraiser said that the fair market value of the property was $63,000. And the report of proceeding is also very clear that that is not the number that was communicated to the appellant in this, that fair market value was $63,000, that the offer that was made pre-suit was $33,000. And really what we're here for is to require any governmental actor to adhere to the fair market value and to negotiate in good faith. I would suggest to this Court that much is made of the failure of the appellant to counteroffer in this particular case. I do not think that that's compelling. I think if the Court looks at the City of Chicago v. Keeney, whose facts are most analogous to this case, that it rejected this logic. Because this is not a private sale where the appellant can simply walk away from, can walk away from the offer. It is something they are forced to do. And if IDOT is not forced to use acceptable parameters, if they do not make an offer that per se correlates to the fair market value of the property, then they have not abided by the process to negotiate in good faith. I would say also that compellingly at the lower court level, one of the reasons is that there was a statement that the desire to save money justifies IDOT's attempt. To negotiate a lower price. From a public policy standpoint, that is absolutely the wrong message that we are sending. Because the law is very clear that the correlation has to be between the fair market value and the offer that's made. Otherwise, what's to stop, you know, in this particular case, the offer could double or triple if we wait another four months. I mean, how would the parameters change? So I would suggest that in this particular case, we have IDOT changing the parameters and artificially changing what it was. So it's a little disingenuous for IDOT to be able to rely on the appraiser when it is changing the parameters for the appraisal itself. And I think that the case law supports this. If you look at, again, Forest Preserve and IDOT versus 154, those cases are distinguishable because in those cases, there were a reliance. There was not a deviation. We're talking about numbers that doubled in a four-month span with no explanation other than IDOT changed its instruction to its appraisal. So it's disingenuous for IDOT to say, on one hand, well, in good faith, we relied on the appraiser's numbers. But we changed the basis for the appraiser to comprise what that valuation was. So it was good faith when we did it because the landowner has absolutely no obligation. And I think that it's imperative for this court to look at the case law on this because I think that the Supreme Court rulings on this are different circumstances. And this is guiding because landowners who are out there are not often in a position where they're able to legally challenge it. And the position that IDOT is asking this court to impose would put private landowners in a position where if they don't obtain a lawyer or obtain an appraisal to counteroffer, then the IDOT has carte blanche authority to move forward and file a condemnation with the argument that, hey, who loses if you get more money out of it? This case, Your Honors, respectfully is about principle. It's about process. It's not about price. And that in order for this court to instruct any governmental actor that when it is negotiating its fiduciary responsibility to negotiate for the state, it has to do so in good faith. It has to give explicit instructions. And it can't simply say, well, we changed the rules from our appraiser, so we are now in a position where we can rely on that. Because what that is allowing in this case is an increase of 50%. That's in line with subpoena where there was a 40% to 60% increase on the properties from the pre-suit offer to the post-suit. And the court specifically rejected all logic that had to do with any affirmative obligation on the part of the landowner to counteroffer. So what the appellant respectfully asks this court to do is that this is a matter of tremendous precedence. It's a matter of the integrity of private property. It's a matter of integrity for landowners. It's a matter of fiduciary responsibility of the state or any governmental actor to negotiate in good faith, to play by the same rules, and to abide by it. Because frankly, in the absence of that, we're setting a precedent that allows magnitude of power to the government to do and take property at whim, without abiding by very, very stringent guidelines that were put in place to protect the landowner. Thank you. Thank you. Thank you. Counsel? May it please the court. Counsel. My name is Kevin Horner, and I'm proud to be here on behalf of the Illinois Department of Transportation. I want to ask you a question right off the bat, Mr. Horner. I'm trying to understand. This is one of the approaches, part of the approach to the new bridge, right, over the Mississippi? That's correct. How and why were the comparables changed in the second appraisal? According to Michelle Berry, who testified for the department, they changed because her approach changed, as she explained, with her first seeking to value the property as a whole, and she felt that that triggered the need for her to look for other comparable sales. What happens here procedurally in all condemnation cases, and what happened in this case, is this process begins well before the case is assigned to counsel and the condemnation case is ultimately filed. It begins with the appraisal process. The necessary properties are determined, and then they're assigned out for valuation, and then the negotiations take place, and only when negotiations fail is there a condemnation case filed, and then the new date of valuation becomes the date of filing. But you knew the purpose. She knew the purpose that the property was to be utilized for. That's correct. And we're only talking about four months' difference, so I still don't understand how this huge fluctuation in price. Well, the way she explained it, it had to do with, again, with her valuation process, and because she was valuing the property as a whole. And explain that to me a little more. What do you mean by as a whole? From an evidentiary standpoint, when we proceed to trial in a condemnation case, we have to ensure that we don't violate what's called the unit rule. So we have to value and it's – we have to establish the value of the whole property, and then we establish the value of the part taken as a part of the whole, and then the appraiser then has to determine did that taking of the part damage the remainder portion of the property. So in this case, there were no instructions given to Michelle Berry. And by the way, Michelle Berry was the only appraiser that testified at hearing. That was the only evidence other than the department's engineer. You know, we are in the business of building roads and bridges. We hire independent experts to value property in condemnation cases. Michelle Berry is not an employee of the Department of Transportation. She is, according to the testimony, and she was the only one to testify. She is a – she is within striking distance of the MAI designation in appraisal, which is the highest designation an appraiser can attain in this country. So she's not – we didn't just pull her off the street, and she didn't just come up with this value out of thin air. So she values the property, and it is her opinion and others like her that the department relies upon when they negotiate. And we don't hold anything back. This is not Zipante. This is not the Naperville v. Old Second National Bank. The Department of Transportation puts it all on the table, and that's what we did here. So would you agree if she hadn't appraised it using the different comparables, it would be more like the City of Chicago case? Well, no, I don't think so. Those cases in Zipante, in the City of Chicago case, that case is different for a couple of reasons, one of which, when counsel talks about, well, that case is so similar because in that case they offered 45 to 50 or 55 percent of what was ultimately determined to be the value. We don't really know because in that case there was no reference at hearing or in the record to the appraisals themselves, the initial appraisals. The court actually commented, if you'll remember in that opinion, they said, basically said something to the effect it would have been nice if we had the benefit of seeing those earlier appraisals. But what if in this case she had appraised the property four months before and then using exactly the same comparables appraised it again and it was doubled? Well, if that had been the case. I'm just trying to understand the basis of your position better. If that had been the case, if on day one she appraised it using three or four comparables and then four months later she appraised it again using the exact same data and the opinion climbed without explanation, then I think we may have that or we may begin to approach the situation that existed in Zapani. There may have been some other extenuating circumstances that caused that fluctuation in value. But the Zapani court clung not only to that but also to the fact that in that case the condemning authority only sent a single letter and made zero follow-up whatsoever. And your position is that you were kind of rebuffed from any further negotiations? Part of my position, Justice Chapman, is, and I'll rhetorically ask the court, what else can we do? We made nine follow-up, we made nine total contacts with this landlord over a period of six to seven weeks. During the second contact, we were told by the company's president something to the effect, and I quoted it in my brief, hey, I think condemnation is the way to go here. The translation to that, to a reasonable person, is get on down the road, we don't want to deal with you. We're not going to negotiate. Negotiation is a two-way street. Negotiation by definition requires a communication by both parties back and forth. And it's difficult, if not impossible, for anybody to negotiate when you're the only one doing the talking. And that's what happened here. We had a hearing. We had not one appraisal, but two. And Michelle Berry, again, close to the MAI designation, her opinions were not challenged by another appraiser. Petroleum fuel offered no evidence whatsoever. She was asked by me because I wanted her to explain to Judge Dauber why the difference in the opinions. And she explained that. Now, there may have been, although the record doesn't bear this out, but I wouldn't be surprised if there were, there may have been some mention by the department following up on my communication with the engineers that, hey, look, we've got to be careful about this unit rule. Just make sure that everybody's on the same page with this unit rule because from an evidentiary standpoint, that's my job to make sure we do that. So for whatever reason, and she explained it when she testified, and she explained it in her subsequent appraisal, she decided to go seek out other counterparts, and that triggered a different value. We didn't throw away or hide the $33,000 appraisal. I think I marked them both at hearing. So the difference between this case and, interestingly, we're essentially talking about the same four cases. And it's interesting to me because counsel thinks these cases support her position, and I think they support mine. And I think when you read these cases and you apply these cases and the reasoning these courts adopted to the facts of this case, you'll agree with me. In this case, we don't have the department holding anything back. This is not Naperville v. Old Second National Bank where they appraised the property at $500,000 and offered $200,000. All right? That alarms me. All right? I think that's not proper. But in this case, we appraised it at $33,000. We offered $33,000. You know, I think to myself, maybe we would be better off not rushing to update our appraisals. Maybe we'd be better off waiting. Let's update them when we proceed to trial. But that's not how we operate, and I'm not going to suggest that we do that. But had we done that, in this case, we would only have one appraiser, the one opinion, with no contrary evidence. I offered all of the evidence at this hearing. Petroleum fuel offered none. So I've already explained to you what we did, and I want to spend a minute talking about what petroleum didn't do. All right? Over six to seven weeks, we made nine contacts with petroleum fuel. They wouldn't return our calls. Now, at some point, we have to get on with building roads and bridges. That's our job. And in this case, when it appeared to us that petroleum fuel, like the President said, on day two or during the second contact, we realized that, yes, we were going to have to proceed with condemnation. Petroleum fuel not only refused to return our telephone calls, but they never, at one time, responded with a counteroffer. They never sought out their own appraisal. We filed a case in January. This case didn't proceed to a quick take hearing until May of this year. Petroleum fuel never got an appraisal. Even to this date, petroleum fuel has never obtained an appraisal that I know of. So what else are we to do? I think what's really at play here, and I appreciate and understand completely the Department's responsibilities, but what this court should be careful about, because this is what counsel really urges this court to do, they encourage this court, petroleum fuel encourages this court, to allow a landowner like them to lay in the weeds and do nothing. And we have this component part of this bridge project, according to the evidence, is upwards of around $47 million of what I suppose, and this is not on the record, but I'm going to guesstimate, because this is only an approach to the bridge itself, we're probably in the billions of dollars. Petroleum fuel wants to lay in the weeds and wait for a quick take hearing, do nothing. We're not going to call you back, we're not going to counteroffer, we're not going to appraise our property, but we're going to try to stall this project. And if I can stall your project, it's like an old-fashioned stick-up. This is a playbook that I've seen before, and this is what they want you to condone. If I can stall this project, then maybe they're going to pay me well more than my property's worth, because I will have stalled the billion-dollar bridge project. That's what's at issue here, and Judge Darber saw through that. Judge Darber viewed this case based upon a totality of circumstances and based upon what the Department knew at the time it was negotiating, and was it proper for the Department to rely upon that opinion. And I think when you apply these cases to the facts of this case, you'll agree with her and my position. Justice Thomas, speaking for a unanimous court in Forest Preserve of DuPage County versus First National Bank of Franklin Park, essentially said the same thing. This court, the Supreme Court, was urged to follow Zipani and Naper versus Second National Bank. And Justice Thomas, speaking for the unanimous court, said we can't view what happened here the same as what happened in those other cases. In those other cases, those were ridiculously low offers without foundation, he said. And they amounted to essentially a take-it-or-leave-it basis. See, we have foundation for our offer. Our foundation was the professional opinion of what I'll call essentially an MAI designation appraisal expert. That was our foundation. We didn't pick this number out of thin air. We didn't get a property evaluated down the street and tell ourselves, well, maybe this property is like that one, so we're going to go ahead and offer them what we did down the road and see what they do with it. No, we have each and every property appraised, and we don't hold any of them. We give them 100 percent of that offer, because that's what we do. And that's, I believe, what the testimony at hearing essentially explained was our policy. So Justice Thomas said, this is not at all like Zipani. You know, this is not at all like Naperville. Because in Naperville, they offer 200 when they appraise it at 500. So I think when you apply the same reasoning that Justice Thomas did in his opinion, and it was Justice Thomas who said basically, and I do prefer to quote him, because he said an offer made by a governmental body based on the advice of an experienced appraisal consultant is normally sufficient to establish a good faith attempt to agree. Again, what else can we do? You know, Justice Rarick, speaking for the court in Department of Transportation v. 151 Interstate Road Corporation, similarly opined that the department's reliance on the appraisal did not demonstrate a lack of good faith. You know, we are relying upon the professional opinion of an independent witness. Petroleum fuel has offered no contrary evidence. You know, counsel suggested toward the end of her argument that landowner has no obligation to do anything. And I disagree with that because negotiation, by definition, requires a two-way communication. So if what she says is true, then how could a condemning authority ever satisfy its obligation to negotiate if a landowner refuses to return their cause, refuses to do anything? I mean, you could arguably be considered as having never negotiated yourself because they won't negotiate. We did negotiate. We attempted to negotiate over a six- to seven-week period, all to no avail. We had two appraisals, not one. And Michelle Berry explained in her testimony the nature of the discrepancies, if one were to consider them discrepancies, in her two appraisals. And Judge Dauber discussed that in her ruling. She recognized those. And I believe she may have even asked some follow-up questions. I can't remember. I won't speak to that because that may not have happened. But at any rate, the record is clear that the trial court considered the totality of the circumstances. They applied what happened here, what was known at the time the negotiations took place, in determining a good faith finding. And we had, I believe the record supports good faith in August, September, October, all the way through up until the time they basically shut down any communications with us. And then again in January of this year when we filed. Interestingly, and I'm not sure whether the record bears this out, but I'm compelled to mention it to you, and I defer to the record. The negotiator's report makes reference to the vast majority of these communications are being left with an attorney-weaveman. And she's the one, when you look at Exhibit 6, I believe it is, that is not responsible. She was present at the hearing, and she didn't testify. So if anything in the negotiator's report were inaccurate, I suppose, or I would certainly expect her to have testified in an effort to try to correct that. But that didn't happen. So I believe that we did all we could. Petroleum fuel did nothing. They wanted to lay in the weeds and try to hold this project up, and they are urging you to help them do that. And I urge this court to resist that and let us, let the department get on with the business of building roads and building bridges. That's all I have unless you have some more questions. I don't think so. We do. Thanks. Thank you. Counsel? What more can IDOT do? IDOT can follow the rules and procure a fair market value that correlates to the actual fair market value of the property. IDOT would have you believe that the burden of proof in this case is on a private landowner. That is absolutely false. The burden of proof at all levels in these proceedings are on IDOT. The appellant has no obligation to establish anything at the hearing other than to point out that IDOT failed to comply with its requirements to make an offer that corresponded to the fair market value. I think it's significant because as I hear the courts questioning, what I see that it's addressing is, well, didn't IDOT know at the time in August, wasn't it doing something in good faith? We're not suggesting that IDOT did anything in bad faith. What we're suggesting is that IDOT changed the parameters to the appraiser that it's relying on. And I am quoting from the report of proceedings from Michelle Berry's testimony, and she's speaking in reference to the second appraisal. When I was updating it for the complaint as of the date of January 30, 2013, and I looked at it, the department wanted me to do it as the whole property with improvements. That's significant. That is the instruction that changed the dynamic of what that appraisal was. But didn't you just say that you're not suggesting that IDOT did anything in bad faith? Isn't that the opposite of good faith? I think not. There's like neutral something. I'm confused. Well, I think that IDOT has an obligation to negotiate in good faith. What that means, I think, under the case law, and I believe that the cases bear this out, is that IDOT is under an affirmative obligation, a per se obligation, to make an offer that correlates to the fair market value of the property. And the reference and the dialogue with respect to the report of the dialogue with respect to the appellant's failure to negotiate, there is no affirmative obligation on the appellant to negotiate these. Were a fair market value to have been offered, this would be a different case. But the fact of the matter is that in the facts of this case, we're talking about a number that doubled in the span of four months. This is not weighing in weight to obstruct a bridge project. This is simply a private landowner requiring that if the state is going to take ground, that they are going to comply with all of the requirements to do it. And I would specifically say, with respect to counsel's argument, that there was no counteroffer, there was no responding appraisal that was submitted. I'm quoting just from the subpoena. It says, we reiterate, as did the appellate court in the city of Naperville, that many property owners in the landowner's position would not be able to incur the legal expenses to challenge the city, which is why a good faith effort to negotiate is necessary. Why a good faith effort to negotiate? Good faith under the city of Chicago, under Naperville, means it has to correlate to the fair market value of the property. And that burden is 100% on the government actor that is requiring it. And I think that under the facts of this case, that simply did not happen. And, in fact, what is made more egregious is that the instruction to the appraiser changed. The scope of the parameters changed. So before I got to say that it relied on something, then change the parameters and change the number, that, per se, invalidates that they made the initial offer in good faith. What I would suggest is the court looks at, and I'll draw it up to your attention just in Exhibit 6, that is on the appellant's brief, there are actually, if you look at the Supreme Court cases that are on point, there's reference to a 60-day notice. The record bears out here, there was never offered, on this matter, a 60-day notice. There is an unsigned negotiator's report that references written communication. But that's the only thing that I got offered with respect to corroborating its negotiation efforts on this point. Your Honors, I would also respectfully draw your attention to the idea that the appellant is holding up a bridge project. My client is a taxpayer in the state of Illinois, and all he's asking is that I, Dodd, or any other governmental actor, follow the rules and play fairly, and they're doing it on behalf of all property owners similarly situated. Thank you, Counselor. I appreciate the briefs and arguments. Counsel, we'll take the case under advisement. Thank you. Thank you. We'll take a short break and then resume at 11. All rise.